IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Debbie Kuciver, individually and on behalf of all others similarly situated, | Case No. 1:21-cv-00936 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Nestlé Healthcare Nutrition, Inc., | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.  Nestlé Healthcare Nutrition, Inc. ("defendant") manufactures, distributes, markets, labels and sells powdered nutritional drink mix under the Carnation Breakfast Essentials brand represented as "Classic French Vanilla" ("Product").



2. The front label represents the Product's characterizing or main flavor is "Classic French Vanilla."

3. "French Vanilla" refers to vanilla from vanilla beans grown in Madagascar, a former French colony.

4. The other representations include "Natural Flavor With Other Natural Flavors" and "No Artificial Flavors."

5. Federal and state law require the Product's front label to inform consumers that the Product contains artificial flavoring. 21 C.F.R. § 101.22(c).

6. The front label was required to disclose that the characterizing French vanilla flavor was not from the ingredient of vanilla or natural flavors but from artificial flavors.[1] 21 C.F.R. § 101.22(i) (requiring statements as to whether flavor is from the characterizing ingredient, natural flavor derived from the ingredient, natural flavor from natural sources other than the ingredient or artificial sources).

7. The ingredient is also required to disclose the presence of artificial flavor, but it does not.

8. Defendant knows consumers seek out products containing natural flavors and avoid artificial flavors, which is why it labels the Product this way.

A. Consumers Seek Natural Flavors

9. Demand for real vanilla "has been steadily increasing…due to consumer demand for natural foods that are free of artificial ingredients."[2]

10. According to one flavor supplier, today's consumers "want real vanilla, not imitation

---

[1] The FDCA and its regulations are incorporated and adopted in Illinois's Illinois Food, Drug and Cosmetic Act ("IFDCA") and its parallel regulations. See 410 ILCS 620/1, et seq.
[2] Chagrin Valley Soap & Salve Company, FAQs, Why Are The Prices of Vanilla Bean Products Always Increasing?

[vanilla] flavoring."

11. Consumers are willing to pay more for natural flavors like real vanilla and are avoiding foods and beverages which contain artificial flavors.[3]

12. At least seven out of ten consumers avoid artificial flavors because they believe the synthetic ingredients are associated with detrimental health effects. [4]

13. Vanilla (*Vanilla planifolia Andrews* and *Vanilla tahitenis Moore*) comes from an orchid plant that originated in Mexico where it was first cultivated.

14. The vanilla orchid produces a fruit pod, the vanilla bean, which is the raw material for vanilla flavorings.

15. The vanilla bean is heated in the sun for weeks, soaked in alcohol and its flavor constituents extracted (vanilla extract).

16. Vanillin (3-methoxy-4-hydroxybenzaldehyde) is the major component of natural vanilla extract and is responsible for roughly one-third of vanilla's flavor and aroma.

17. Vanillin is found in the form of its β-D-glucoside (glucovanillin) in green vanilla beans.

18. The curing process, including the hydrolysis of its β-D-glucoside, leads to the release of vanillin from glucovanillin, at concentrations of 1-4% of dry weight of cured beans.

19. Vanilla's unique flavor is due to the hundreds of odor-active compounds besides vanillin, such as acids, ethers, alcohols, acetals, heterocyclics, phenolics, hydrocarbons, esters and carbonyls.

20. Methyl cinnamate and cinnamyl alcohol provide cinnamon and creamy notes.

---

[3] Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.
[4] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018.

21. P-cresol contributes flavor notes described as woody and spicy.

22. Acetovanillone provides a sweet, honey taste.

23. P-hydroxybenzoic acid and vanillic acid are significant phenolic compounds which contribute to vanilla's aroma.

24. 4-methoxybenzaldehyde (p-anisaldehyde) and 4-methoxybenzyl alcohol (p-anisyl alcohol) provide creamy and floral flavor notes.

25. The isolation of vanillin from vanilla in the late 19th century resulted in foods purporting to contain vanilla, which either contained no vanilla or a trace or *de minimis* amount, boosted by low cost, synthetic vanillin.

II. Defendant Knows there are Two Types of Vanillin

26. Defendant knows there are two types of vanillin – natural vanillin from the vanilla plant and artificial vanillin from sources such as petroleum and lignin and made through artificial processes.

27. Vanillin is not isolated commercially since it is part of vanilla extract.

28. Vanillin is a synthetic flavoring substance. 21 C.F.R.§ 182.60 ("Synthetic flavoring substances and adjuvants.").

29. Under very limited circumstances, vanillin could be a "naturally produced flavor" if made from a natural source and through a natural process such as distillation, roasting, heating, enzymolysis or fermentation. 21 C.F.R. § 101.22(a)(3).

30. However, enzymatic reactions converting eugenol (and other natural sources) to vanillin are seldom used and very costly.

31. For instance, the rate of conversion of eugenol to vanillin is very low, due to the toxicity and limited water solubility of eugenol.

3

32. The FDA defines artificial flavor as any flavoring from a synthetic source or made through an artificial process. 21 C.F.R. § 101.22(a)(1).

33. These artificial processes include all processes other than those described as acceptable for making a "natural flavor."

34. The main sources of vanillin are petroleum (guaiacol), lignin (tree pulp), eugenol or ferulic acid.

    i. <u>Vanillin from Guaiacol</u>

35. Guaiacol is the source of 85% of vanillin.

36. It is obtained from the synthetic petrochemicals, benzene and propylene, whose industrial source is petroleum.

37. Converting guaiacol to vanillin entails condensation with glyoxylic acid.

38. The processes include chemical reactions such as decarboxylation and aromatic substitution.

39. Vanillin from guaiacol is an artificial flavor because it is from an artificial source and undergoes artificial processes.

    ii. <u>Vanillin from Lignin</u>

40. Vanillin is also derived from lignin, present in sulfite wastes of the wood pulp industry.

41. These sulfite wastes contain chemicals used in the processing of wood pulp and are therefore not considered a natural source.

42. Lignin is difficult to degrade by natural means, which is why production of vanillin from lignin entails artificial processes including chemical reactions with the presence of chemical catalysts.

4

43. Lignin is broken down either with sodium hydroxide or calcium hydroxide and simultaneously oxidized in air in the presence of chemical catalysts.

44. When these chemical reactions are completed, the solid wastes and vanillin are removed from the acidified solution with a non-natural solvent, e.g., butanol or benzene, and reextracted with sodium hydrogen sulfite solution.

45. The vanillin is subjected to reacidification with sulfuric acid followed by vacuum distillation, and several recrystallization cycles.

46. Vanillin from lignin is an artificial flavor because the sulfite wastes of wood pulp are not a natural source, and the chemical reactions used to convert it to vanillin are not natural processes.

47. Vanillin from lignin is an artificial flavor because the sulfite wastes contain chemicals from the processing of wood pulp and are therefore not a natural source.

48. Vanillin from lignin is an artificial flavor because it undergoes artificial processes in being converted to vanillin.

   iii.   <u>Vanillin from Eugenol</u>

49. Eugenol, the major constituent of clove oil, is a source of vanillin.

50. The first method of converting eugenol to vanillin requires isomerization of eugenol to isoeugenol under alkaline conditions, followed by side-chain cleavage to vanillin and two-carbon moiety under acidic conditions.

51. The second method of converting eugenol to vanillin involves the intermediary of coniferyl alcohol which is oxidized to ferulic acid.

52. The ferulic acid is subjected to high heat of 800 degrees Celsius, high amounts of pressure, 20 atmospheric pressure units, and chemical catalysts, sodium hydroxide or sodium

chloride.

53. The high heat, high pressure and chemical catalysts are outside of what is considered a natural process for producing a natural flavor.

54. Vanillin from eugenol is an artificial flavor because the high heat, high pressure and chemical catalysts are outside of what is considered a natural process for producing a natural flavor.

A. Vanillin added to Vanilla is Always Required to be Listed as Artificial Flavor

55. According to the FDA, all vanillin from non-vanilla sources is an artificial flavor.

56. This issue was extensively discussed in a 2018 article by The Flavor Extract Manufacturer's Association ("FEMA"), "Labeling Vanilla Flavorings and Vanilla Flavored Foods in the U.S.," in Perfumer & Flavorist.[5]

57. The article cites recent regulatory correspondence emphasizing that it is deceptive to use artificial vanillin in a vanilla flavored food without disclosing it as artificially flavored.

58. The FDA has repeatedly stated it is misleading to label a food as "(French/Madagascar) Vanilla" with an emphasis on "natural flavors" and "no artificial flavors" because this implies the food or beverage is naturally flavored with vanilla, even though the flavor is not derived from vanilla beans.

59. Because the Product purports to have a characterizing flavor of (French/Madagascar) vanilla but is flavored predominantly from vanillin, it must be identified as "artificially flavored."

---

[5] John B. Hallagan and Joanna Drake, FEMA, "Labeling Vanilla Flavorings and Vanilla Flavored Foods in the U.S.," Perfumer & Flavorist, Vol. 43 at p. 46, Apr. 25, 2018 ("Hallagan & Drake").

6

III. Ingredient List is Misleading

60. Analytical testing of the Product in the fall of 2020 revealed it contains the artificial version of vanillin.

61. This was concluded because (1) the amount of vanillin was significantly greater than it would be if it were only present because of the Product containing vanilla as *part* of the "Natural Flavor" ingredient and (2) the vanillin was unaccompanied by the expected amounts of other aromatic compounds from the vanilla plant.

62. For instance, the Product's flavoring failed to reveal detectable levels of methyl cinnamate, cinnamyl alcohol, p-cresol, acetovanillone, p-hydroxybenzoic acid, 4-methoxybnzaldehyde (p-anisaldehyde), 4-methyoxybenzyl alcohol (p-anisyl alcohol) and/or vanillic acid, even though these compounds were analyzed for.

63. The absence of these compounds also means the Product contains, at most, a trace or de minimis amount of vanilla.

64. In addition to containing artificial flavor, the Product lacks the expected (French) vanilla taste because vanillin is not synonymous with vanilla, due to the absence of the critical odor-active compounds which together provide the flavor of vanilla.

65. The Product's ingredient list tacitly reveals it is not flavored exclusively with vanilla because it lists the generic ingredient "natural flavor" instead of vanilla extract.

66. However, the ingredient list conceals the added artificial flavor – vanillin – as part of the generic "natural flavors" and "natural flavor" instead of using the specific, non-generic name of the ingredient – "vanillin" or "artificial flavor." 21 C.F.R. § 101.4(b)(1).

7

**INGREDIENTS:** NONFAT MILK, MALTODEXTRIN, SUGAR, VITAMINS AND MINERALS‡, AND LESS THAN 2% OF LACTOSE, CELLULOSE GUM, NATURAL FLAVOR

INGREDIENTS: NONFAT MILK, MALTODEXTRIN, SUGAR, VITAMINS AND MINERALS‡, AND LESS THAN 2% OF LACTOSE, CELLULOSE GUM, NATURAL FLAVOR

67. Even if reasonable consumers were to investigate the "French Vanilla," "Natural Flavor With Other Natural Flavors" and "No Artificial Flavors" statements on the Product's front label by scrutinizing the ingredient list on the back, consumers would still be unaware that the Product contained artificial flavor.

68. According to labeling experts – but not reasonable consumers – "Brands that print phrases like 'natural vanilla' [or 'natural flavor'] on their packages may actually be pushing products that contain anything but."[6]

69. Professor of Food Science, Scott Rankin, at the University of Wisconsin-Madison, explained that "the different wordings on the labels amount to an industry shorthand for specific kinds of natural or artificial flavorings."

70. For instance, "natural vanilla flavor" often refers to "vanillin extracted from wood."

71. "Natural flavor" on the other hand, "(with no mention of vanilla at all) indicates just a trace of natural vanilla (there's no required level)" and other flavorings that simulate vanilla.

72. Defendant's "Natural Flavor" contains added artificial vanillin yet fails to disclose it separately as either "vanillin" or "artificial flavor" even though it is required to.

---

[6] Yahoo Food, The One Thing You Need to Know When Buying Vanilla Ice Cream, May 20, 2015 (though the discussion was centered on ice cream, the identification of ingredients is identical on ice cream or oat milk).

8

73. Defendant adds artificial vanillin to give the Product a "sweet, creamy" taste that is part of the vanilla taste.

74. Unlike vanilla with hundreds of flavor compounds, vanillin also has a "chemical-like" taste.

75. Although the flavoring used to simulate the Product's characterizing vanilla flavor is (1) not from vanilla beans, (2) from an artificial petrochemical source and (3) made through an artificial process, Defendant pretends otherwise, conflating natural and artificial flavoring and deceiving consumers.

76. Even if the added artificial vanillin used in the Product was made from a natural source and through a natural process, the Product would still be required to state "artificially flavored" on the front label.

77. Because the Product contains artificial flavor that "simulates, resembles or reinforces the characterizing flavor," the front label is required to state, "Artificially Flavored." 21 C.F.R. § 101.22(i)(2).

78. Reasonable consumers must and do rely on defendant to honestly report what its products contain – natural ingredients, especially active ingredients that are natural.

79. Defendant misrepresented the Products through affirmative statements, half-truths, and omissions.

80. Defendant sold more of the Product and at a higher price than it would have in absence of this misconduct, resulting in additional profits at the expense of consumers.

81. Had plaintiff and the proposed class members known the truth, they would not have bought the Product or would have paid less for it.

82. As a result of the false and misleading representations, the Product is sold at a

9

premium price, approximately no less than no less than $5.99 for 10-1.26 OZ packets, excluding tax, compared to other similar products represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## Jurisdiction and Venue

83. Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

84. Under CAFA, district courts have original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity.

85. Plaintiff Debbie Kuciver is a citizen of Illinois.

86. Defendant Nestlé Healthcare Nutrition, Inc. is a Delaware corporation with a principal place of business in Bridgewater, Somerset County, New Jersey.

87. Diversity exists because plaintiff Debbie Kuciver and defendant are citizens of different states.

88. Upon information and belief, sales of the Product and any available statutory and other monetary damages, exceed $5 million during the applicable statutes of limitations, exclusive of interest and costs.

89. Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred here – plaintiff's purchase of the Product.

90. Venue is further supported because many class members reside in this District.

## Parties

91. Plaintiff Debbie Kuciver is a citizen of Wood Dale, DuPage County, Illinois.

92. Defendant Nestlé Healthcare Nutrition, Inc. is a Delaware corporation with a principal place of business in Bridgewater, New Jersey, Somerset County.

93. Defendant is the nutrition products subdivision of Nestle, S.A., the largest food company in the world.

94. The Product is sold to consumers from retail and online stores of third-parties across the country.

95. Plaintiff bought the Product, Carnation Breakfast Essentials, Classic French Vanilla, Powder Drink Mix, on one or more occasions within the statute of limitations for each cause of action alleged, from one or more locations, including Jewel-Osco, 343 W Irving Park Rd, Wood Dale, IL 60191, between January 18 and February 18, 2021.

96. Plaintiff bought the Product at or exceeding the above-referenced price because she wanted to buy a product with the qualities and attributes represented herein and relied upon what the label indicated and/or omitted.

97. Plaintiff would not have purchased the Product in the absence of Defendant's misrepresentations and omissions.

98. The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

99. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance that Product's labeling is consistent with its composition.

## Class Allegations

100. The class will consist of all purchasers of the Product who reside in Illinois during the applicable statutes of limitations.

101. Plaintiff seeks class-wide injunctive relief based on Rule 23(b) in addition to a monetary relief class.

102. Common questions of law or fact predominate and include whether defendant's

representations were and are misleading and if plaintiff and class members are entitled to damages.

103. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

104. Plaintiff is an adequate representative because her interests do not conflict with other members.

105. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

106. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

107. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

108. Plaintiff seeks class-wide injunctive relief because the practices continue.

Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.
(Consumer Protection Statutes)

109. Plaintiff incorporates by reference all preceding paragraphs.

110. Plaintiff and class members desired to purchase products with the attributes highlighted by the labeling and marketing.

111. Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

112. Defendant misrepresented the Product through its statements, omissions, ambiguities, half-truths and/or actions.

113. Defendant intended that Plaintiff and the Class rely upon Defendant's deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

114. Defendant knew or should have known that its representations about the Product's flavoring source were material and likely to mislead consumers.

115. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Breaches of Express Warranty, Implied Warranty of Merchantability
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

116. Plaintiff incorporates by reference all preceding paragraphs.

117. The Product was manufactured, labeled and sold by defendant and warranted to plaintiff and class members that it possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and health-related attributes which it did not.

118. The presence or absence of the relevant components was expressly and impliedly warranted to Plaintiff and others.

119. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

120. This duty is based on Defendant's outsized role in the market for this type of Product – non-traditional medicinal-like products.

121. Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

122. Defendant received notice and should have been aware of these misrepresentations due to numerous complaints by regulators and consumers to its main office over the past several years regarding the Product.

123. The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable because they were not fit to pass in the trade as advertised.

124. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Negligent Misrepresentation

125. Plaintiff incorporates by reference all preceding paragraphs.

126. Defendant had a duty to truthfully represent the Product, which it breached.

127. This duty is based on defendant's position, holding itself out as having special knowledge and experience in the sale of the product type.

128. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in defendant, a well-known and respected brand or entity in this sector.

129. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the Product.

130. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Fraud

131. Plaintiff incorporates by reference all preceding paragraphs.

132. Defendant misrepresented and/or omitted the attributes and qualities of the Product.

133. Defendant's fraudulent intent is evinced by its failure to accurately disclose the issues described herein, when it knew not doing so would mislead consumers.

134. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Unjust Enrichment</u>

135. Plaintiff incorporates by reference all preceding paragraphs.

136. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated: February 19, 2021

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
60 Cutter Mill Rd Ste 409

15

Great Neck NY 11021-3104
Tel: (516) 268-7080
Fax: (516) 234-7800
spencer@spencersheehan.com

16